Steven John Moser (SM1133)
Steven J. Moser, P.C.
3 School Street, Suite 207B
Glen Cove, New York  11542
(516) 671-1150 • F (516) 882-5420
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Dawn Ruggerio

                        Plaintiff,

-*against*-

The County of Suffolk and Suffolk County Police Department,

                        Defendants.

Case No.:

**COMPLAINT**
**JURY TRIAL DEMANDED**

Plaintiff Dawn Ruggiero, by her attorney, STEVEN J. MOSER, P.C., hereby files this complaint against the County of Suffolk and Suffolk County Police Department (collectively "SCPD") for violations of the Family and Medical Leave Act of 1993, the Americans with Disabilities Act of 1990, as amended and New York State Executive Law (Human Rights Law) Art. 15, § 296 (1)(a).

INTRODUCTION AND LAW

1. Under the Family and Medical Leave Act of 1993, as amended ("the FMLA"), "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" in order to care for the employee's child "with a "serious health condition," as well as for other circumstances.  U.S.C. §§ 2601 et seq., § 2612 (a)(1)(C).  FMLA leave to care for the employee's child "may be taken intermittently or on a reduced leave schedule when medically necessary."  § 2612 (a)(1)(C).

1

2. The Americans with Disabilities Act of 1990 ("the ADA") provides, in part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to… employee compensation," as well as other aspects of employment. 42 U.S.C. § 12112(a).

3. The ADA contemplates that employers will engage in "an 'interactive process' [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)(quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir.2000) ). The employer's obligation to enter into the interactive process is not triggered only by a specific request for an accommodation, but also by simply becoming aware of a disability. *See Brady*, 531 F.3d at 135.

4. The individualized interactive process is itself an accommodation, the denial of which constitutes a violation of the New York Human Rights Law. *See Phillips v. City of New York,* 66 A.D.3d 170, 176, 884 N.Y.S.2d 369, 373 (N.Y. App. Div. 2009); *Jochelman v New York State Banking Dept.,* 2010 WL 3951820, 2010 NY Misc LEXIS 4823, 2010 NY Slip Op 32750 (Sup Ct.), *affd* 83 AD3d 540, 920 NYS2d 661 (N.Y. App. Div 2011); *Vinokur v. Sovereign Bank,* 701 F. Supp. 2d 276, 293 (E.D.N.Y. 2010).

5. The Suffolk County Police Department ("the SCPD") denied its employee, Dawn Ruggiero, a Public Safety Dispatcher I, the intermittent leave she requested under the FMLA to care for her son who, following an injury, suffered from "severe behavioral and mental disorders," which were serious health conditions.

6. Then, when Dawn herself developed post-traumatic stress disorder ("PTSD"), the SCPD granted her request for extended sick leave but treated her unfavorably by denying her the

compensation provided for in her union's collective bargaining agreement ("the CBA"), sick leave at ½ pay, because of her disability. PTSD is a recognized disability under the ADA. 29 CFR §1630.2j3iii.

7. As a result of the SCPD's denial of compensation to Dawn during her medical leave, she experienced financial distress, in addition to the symptoms of PTSD, forcing her to return to work before the end of her sick leave.

8. Moreover, despite being advised that Dawn suffered from PTSD, the SCPD failed to engage in an interactive process with her to determine how she could be accommodated.

9. The SCPD has violated the FMLA by failing to honor Dawn's request for intermittent leave under the FMLA.

10. The SCPD has violated the ADA and the Human Rights Law by discriminating against Dawn because of her disability, denying her the compensation which others received.

11. The SCPD has violated the New York Human Rights Law by failing to engage in an interactive process with Dawn after the SCPD became aware that she suffers from PTSD.

12. The SCPD's violation of the ADA and the Human Rights Law with respect to Dawn is only one in a series of continuing ADA violations against other employees who are Public Safety Dispatchers and 911 Operators at the SCPD. ADA violations for the other employees include disability discrimination, retaliation and failure to reasonably accommodate their disabilities.

13. The multiple ADA violations against Dawn and the other employees relate to the SCPD's pattern and practice of violating the ADA and the Human Rights Law. First, the department set artificial guidelines for requests for accommodations. Thus, even if the SCPD was made aware of a disability through a note from a physician, the SCPD would not even

consider a request for an accommodation unless it met the SCPD's internal guidelines. Then, in January 2013, the SCPD announced that absolutely no exemptions from mandated overtime would be honored.

14. In effect, Public Safety Dispatchers are required by the SCPD to be "disability-free" in order to keep their jobs.

15. The SCPD has refused to enter into the "interactive process" envisioned by the ADA and the Human Rights Law with regard to 911 operators and Public Safety Dispatchers.

16. The SCPD applied a variant of the "disability-free" policy to Dawn in its denial of ½ pay for extended sick leave for herself, which Dawn requested on May 28, 2013. The SCPD has determined that compensation at ½ pay for "extended sick leave may be used once per illness…applied equally to all employees…regardless of disability," and not for "a recurrence of the same illness." The SCPD has explained that since Dawn had an extended sick leave with ½ pay back in 2006 for "adjustment disorder with mixed anxiety and depressed mood," Dawn could not be compensated, some seven years later, in 2013, for an extended sick leave for "anxiety and post-traumatic stress syndrome," as it was, according to an SCPD payroll supervisor, purportedly the same illness that Dawn had in 2006.

17. However, according to the Diagnostic and Statistical Manual of Mental Disorders IV ("DSM IV"), "anxiety and post-traumatic stress syndrome" is not the same illness as "adjustment disorder with mixed anxiety and depressed mood;" they are two different mental disorders. Posttraumatic Stress Disorder is a type of Anxiety Disorder and is given DSM IV Code 309.81, whereas DSM IV Code 309.28 is used for an Adjustment Disorder, With Mixed Anxiety and Depressed Mood.

18. The SCPD's mis-combining two different mental disorders into one purportedly pre-existing disorder is consonant with its 2013 discriminatory employment policy of not recognizing employees' disabilities even when medically documented. The result was that Dawn was denied the compensation she was entitled to under the CBA, despite the SCPD's statement that its policy of extended sick leave at ½ pay was "applied equally to all employees…regardless of disability."

19. The SCPD, by its adverse employment actions against Dawn and her co-workers, has willfully violated their rights under the ADA and the Human Rights Law and, unfortunately, caused them to choose between their jobs and their health.

## PERMISSION TO AMEND

20. The Plaintiff respectfully requests that the court grant permission to amend this complaint to include the ADA and NYHRL discrimination claims for individual and systemic disparate treatment, for Dawn's co-workers with disabilities, who were also subjected to the SCPD's discriminatory employment policy. Alternatively, the Plaintiff requests that the court consolidate all the individual cases for joint trial.

21. Dawn's disabled co-workers have filed charges with the EEOC, which are pending. Under the single filing rule adopted by the Second Circuit, the Plaintiff requests that the co-workers be allowed to add their claims to this complaint without further review by the EEOC. *Snell v. Suffolk County*, 782 F.2d 1094, 1101 (2d Cir. 1986).

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

23. In addition, the Court has jurisdiction over Plaintiffs' claims under the FLMA pursuant to 29 U.S.C. 2601§ 107(a)(2) and under Title I of the ADA pursuant to 42 U.S.C. § 12117.

24. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391. A substantial part of the events or omissions giving rise to claims in Complaint occurred within the Eastern District.

## PARTIES

25. Plaintiff Dawn Ruggiero ("Dawn") is a natural person who resides in Suffolk County, New York.

26. The County of Suffolk is a County Government within the State of New York.

27. Defendant Suffolk County Police Department is an agency or department of the Suffolk County Government, with headquarters at 30 Yaphank Avenue, Yaphank, NY 11980.

28. The defendants are collectively referred to herein as the SCPD.

## FACTS

29. The SCPD is an employer with more than 50 employees, engaged in commerce or in an industry or activity affecting commerce, and is a public agency.

30. Dawn Ruggiero ("Dawn") has been employed as a Public Safety Dispatcher I, a civilian employee position, in the 3rd Precinct of the SCPD, from November 13, 2001 until the present.

31. As a Public Safety Dispatcher I, Dawn's job functions include monitoring 911 emergency calls and dispatching the calls to the appropriate police unit, while continuously monitoring five computers.

32. The basic terms and conditions of Dawn's employment were covered by the Collective Bargaining Agreement ("CBA") between Suffolk County and the AME, in effect between November 13, 2001 and December 31, 2013.

33. Dawn is a member of the Association of Municipal Employees ("AME") and a member in good standing.

34. Since the start of her employment with the SCPD, Dawn has worked rotating blocks of 5 continuous days  week for a total of 35 hours, , plus additional mandatary overtime hours.

35. Dawn's schedule alternates weekly.  She works a shift from 8:00 a.m. to 4:00 p.m. for one week and then a shift from 4:00 p.m. to 12:00 a.m. the next week.

36. Mandatory overtime hours are unpredictable.

37. Mandatory overtime hours are often not scheduled in advance, but assigned during a shift and then added onto that shift consecutively.

38. The SCPD has added mandatory overtime hours, which could not be refused, to Dawn's shifts weekly, since 2013.

39. On January 31, 2013, Brian Ruggiero ("Brian"), Dawn's son, was diagnosed with generalized anxiety disorder and delayed sleep disorder.

40. Generalized anxiety disorder and delayed sleep disorder are serious health conditions involving continuing treatment by health care providers.

41. Due to his serious health conditions, Brian was unable to attend school.

42. Brian's serious health conditions required Dawn's assistance for his basic medical needs, personal needs and transportation.

43. Dawn's presence provided psychological comfort to Brian.

44. Dawn's presence was beneficial to Brian and assisted in his recovery.

45. On May 14, 2013, Dawn submitted by application a request to the SCPD for Family and Medical Leave ("the FMLA request") to care for Brian.

46. During the 12 months prior to Dawn's FMLA request on May 14, 2013, Dawn worked more hours than the minimum of 1,250 hours required for leave under the FMLA.

47. During the 12 months prior to Dawn's FMLA request on May 14, 2013, Dawn worked 479 hours of overtime.

48. The FMLA request gave notice to the SCPD of Dawn's intention to take FMLA leave.

49. The FMLA request included a verifying medical certification ("the medical certification") by Brian's health care provider.

50. The medical certification stated that Dawn needed to work intermittently or on less than a full schedule for her son's continuing treatment.

51. The medical certification provided the date Brian's medical condition began, its estimated duration and a medical description of Brian's health condition.

52. The medical certification described the duration of Brian's condition as an estimated 1 month for Brian's anxiety to be "well controlled," but "impossible to predict with certainty."

53. The medical certification described the need for Dawn's FMLA leave, as a result of her son's health condition, as "ongoing-indefinitely."

54. On May 23, 2013, Jennifer McNamara, Esq., Acting Director of Labor Relations for Suffolk County sent Dawn a letter denying the FMLA request. A copy of the denial is annexed hereto as Exhibit 1.

55. The basis of the denial of Dawn's FMLA request was that, "intermittent Family Medical Leave must be scheduled leave with the approval of the Department and not disrupt departmental operations."  Id.

56. The SCPD did not give Dawn an opportunity to cure any purported deficiencies it found in the FMLA request.

57. "The FMLA does not permit an employer to withhold approval of a request for FMLA leave if an exact schedule of leave is not submitted."  U.S. DOL Wage and Hour Division Opinion Letter FMLA2002-6, Dec. 4, 2002.   www.dol.gov/whd/opinion/FMLA/ 2002_12_04_6_FMLA.htm (last visited 12/20/2014).

58. After Dawn submitted the FMLA request on May 14, 2013, the SCPD did not give Dawn an opportunity to consult with the SCPD to work out the dates or times for a mutually suitable schedule for her FMLA leave that would not unduly disrupt Departmental operations.

59. After Dawn submitted the FMLA request, the SCPD did not initiate discussions with Dawn about making arrangements for a schedule of dates or times for her FMLA leave, subject to the approval of her son's health care provider.

60. After Dawn submitted the FMLA request, the SCPD did not ask Dawn to attempt to make further arrangements for a schedule of FMLA leave, subject to the approval of her son's health care provider.

61. On or about May 28, 2013, Dawn requested a medical leave of absence from the SCPD for herself because she was suffering from anxiety and posttraumatic stress disorder.

62. PTSD is a recognized disability under ADA regulations.  29 CFR § 1630.(2)(j)(3)(iii).

63. Beginning in May of 2013, Dawn experienced rapid, consecutive, uncontrollable thoughts about terrifying and traumatic events and emergencies she had handled and been witness to as a Public Safety Dispatcher.

64. Some of the terrifying and traumatic events and emergencies Dawn rapidly recalled during her PTSD, some from years earlier, included: police or members of the public screaming, being shot, stabbed or beaten, or pleading for help and sobbing, or finding an immediate family member dead from suicide by hanging.

65. Posttraumatic Stress Disorder is a type of Anxiety Disorder and is given DSM IV Code 309.81.

66. Diagnosis of PTSD requires exposure to an event that involved or held the threat of death, violence or serious injury.   http://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/basics/definition/CON-20022540?p=1 (last visited 12/22/2014).

67. Researchers at Northern Illinois University found, in a research study of the relationship between work-related trauma exposure and PTSD symptomology in emergency dispatchers, that the dispatchers had high levels of peritraumatic stress, which correlated positively with PTSD symptomatology.  Heather Pierce and Michelle M. Lilly, *Duty-Related Trauma Exposure in 911 Telecommunicators: Considering the Risk of Posttraumatic Stress*, Journal of Traumatic Stress, April 25, 2012, at 211-215.

68. Despite the high levels of stress that Dawn and her co-workers endure on a daily basis, there is no on-site counselor or mental health professional available.   There is no "down time" between extremely stressful calls to allow Public Safety Dispatchers and 911 Operators to calm themselves.

69. Rather than being supported in the important work they do for the public, Public Safety Dispatchers and 911 Operators have been told by SCPD representatives that stress is part of their job, they are working in these conditions by their own choice, and no one is forcing them to do this work. At times during 2013 and 2014, they were required to work extended shifts of 12 hours with few breaks. There were no 911 Operators or Public Safety Dispatchers hired by the SCPD in 2012. Furthermore, the SCPD has needlessly increased these employees' workload by routing non-emergency calls through the 9-1-1 system.

70. The collective bargaining agreement ("the CBA") of the Suffolk County Association of Municipal Employees states in section 8.8 that an employee will earn sick time "at a rate of one half day per pay period. If all sick time has been used, extended sick leave for an illness which lasts longer that 20 work days shall be granted at the rate of one pay period at half pay for each year of continuous service completed."

71. Dawn had sufficient years of continuous service with the SCPD to qualify for extended sick leave, for four bi-weekly pay periods [40 days], under section 8.8 of the CBA, when she applied for leave for her PTSD.

72. On or about May 30, 2013, the SCPD denied Dawn's request for extended sick leave with ½ pay.

73. The SCPD granted Dawn a leave of absence, in which she would use accrued sick time from May 28, 2013 to June 6, 2013, with pay, then unpaid sick leave from June 7, 2013 to August 11, 2013, [76 workdays].

74. The SCPD has recently explained that since Dawn had an extended sick leave with ½ pay back in 2006 for "adjustment disorder with mixed anxiety and depressed mood," Dawn could not be compensated, some seven years later, in 2013, for an extended sick leave for

11

"anxiety and post-traumatic stress syndrome," as it was, according to an SCPD payroll supervisor, purportedly the same illness that Dawn had in 2006.

75. The SCPD has determined that compensation at ½ pay for "extended sick leave may be used once per illness…applied equally to all employees…regardless of disability," and not for "a recurrence of the same illness."

76. However, according to the Diagnostic and Statistical Manual of Mental Disorders IV ("DSM IV"), "anxiety and post-traumatic stress syndrome" is not the same illness as "adjustment disorder with mixed anxiety and depressed mood;" they are two different mental disorders. Posttraumatic Stress Disorder is a type of Anxiety Disorder and is given DSM IV Code 309.81, whereas DSM IV Code 309.28 is used for an Adjustment Disorder, With Mixed Anxiety And Depressed Mood.

77. Since being made aware of Dawn's disability, the Suffolk County Police Department has failed to engage in an interactive process with Dawn.

78. As a result of the SCPD's denial of ½ pay to Dawn for her mental disability, during her extended sick leave, she experienced financial distress, in addition to the symptoms of PTSD, forcing her to return to work before the end of her sick leave, on July 13, 2013.

79. On June 27, 2013, Dawn filed a complaint of discrimination with the New York State Division of Human Rights ("the NYSDHR") for disability discrimination, which was dually filed with the EEOC.

80. On July 1, 2013, Dawn filed a grievance against the SCPD for its denial of ½ pay for extended sick leave.

81. SCPD denied the grievance as being without merit on July 22, 2013.

82. On December 27, 2013, the NYSDHR informed Dawn and the SCPD that it found probable cause for employment discrimination based on disability.

83. A public hearing was scheduled for early June 2014 before an Administrative Law Judge of the New York State Division of Human Rights.   Before the hearing the Division of Human Rights dismissed the charges on the basis of administrative convenience to allow Dawn to pursue her remedies in court.

84. On September 24, 2014, Dawn received a notice of right to sue letter from the Equal Employment Opportunity Commission.   A copy of the right to sue letter is annexed hereto as Exhibit 2.

FIRST CAUSE OF ACTION

INTERFERENCE WITH FMLA RIGHTS UNDER 29 U.S.C. § 2615(a)(1)

85. Plaintiff hereby repeats and realleges each and every preceding allegation, inclusive, as if fully set forth herein.

86. The Plaintiff was an eligible employee under the FMLA, and more specifically 29 USCS § 2611(2)(A).

87. The Defendant County of Suffolk is an employer as defined under the FMLA, and more specifically 29 U.S.C. § 2611(4)(A).

88. Each Defendant is an employer as defined under the FMLA.

89. The Plaintiff requested leave to care for her son in May 2013.

90. Notice of Plaintiff's intention to take leave to care for her son was given to the Defendants.

91. The Plaintiff was entitled to leave to care for her son.

92. The Plaintiff was denied leave to care for her son by the Defendants.

13

## SECOND CAUSE OF ACTION

## DISCRIMINATION UNDER THE ADA

93. Plaintiff hereby repeats and realleges each and every preceding allegation, inclusive, as if fully set forth herein.

94. The ADA states that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

95. Each Defendant is an employer that is subject to the ADA under 42 USC 12111(5).

96. Plaintiff was an employee of Defendants within the meaning of 42 USC 12111(4).

97. Plaintiff was disabled within the meaning of the ADA (42 USCS § 12102(1));

98. Plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation.

99. Plaintiff was denied benefits to which other, non-disabled employees were granted under the terms of the CBA (including ½ pay), and was forced to return to work due to the denial of the leave with half-pay.

## THIRD CAUSE OF ACTION

## DISCRIMINATION UNDER THE HUMAN RIGHTS LAW

100. Plaintiff hereby repeats and realleges each and every preceding allegation, inclusive, as if fully set forth herein.

101. The Defendants were employers under the Human Rights Law § 292.

102. Plaintiff was an employee under the Human Rights Law § 292.

103. Plaintiff was a person with a disability under the meaning of the Human Rights Law § 292.

104. Plaintiff could perform the essential functions of her job with or without a reasonable accommodation.

105. Plaintiff was denied benefits to which other, non-disabled employees were granted under the terms of the CBA (including ½ pay), and was forced to return to work due to the denial of the leave with half-pay.

## FOURTH CAUSE OF ACTION

## FAILURE TO ACCOMMODATE IN VIOLATION OF ADA

106. Plaintiff hereby repeats and realleges each and every preceding allegation, inclusive, as if fully set forth herein.

107. Under the ADA, the definition of discrimination includes, among other things, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. . ." 42 U.S.C. § 12112(b)(5)(A).

108. An employer is required to provide a reasonable accommodation to employees who are either "actually disabled" (§ 1630.2(g)(1)(i)), or have a "record of a disability" (§ 1630.2(g)(1)(ii)). 29 C.F.R. § 1630.9.

109. Employers who know that an employee has a disability must make a reasonable effort to determine the appropriate accommodation.

110. The Defendants knew that the Plaintiff was either "actually disabled" or had a "record of a disability."

111. Plaintiff could perform the essential functions of her jobs with or without a reasonable accommodation.

15

112. Defendants have failed to enact and/or implement policies regarding engaging in an interactive process with Public Safety Dispatchers and 911 Operators, including the Plaintiff.

113. Defendants failed to reasonably accommodate the actual or perceived disabilities of the Plaintiff.

114. Defendants' actions constitute willful violations of the ADA for which Plaintiff is entitled to an award of punitive damages.

115. Plaintiff is entitled to declaratory and injunctive relief requiring Defendants to enact and implement procedures consistent with Defendants' obligation to engage in the interactive process.

## FIFTH CAUSE OF ACTION

## FAILURE TO ACCOMMODATE UNDER THE HUMAN RIGHTS LAW

116. The New York Human Rights Law prohibits discrimination in employment on the basis of disability. N.Y. Exec. Law § 296 (a)(1).

117. Discrimination includes "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities. . ." N.Y. Exec. Law § 296 (c)(i).

118. The interactive process is itself an accommodation, the denial of which constitutes a violation of the New York Human Rights Law. *See Phillips v. City of New York*, 66 A.D.3d 170, 176, 884 N.Y.S.2d 369, 373 (N.Y. App. Div. 2009); *Jochelman v New York State Banking Dept.*, 2010 WL 3951820, 2010 NY Misc LEXIS 4823, 2010 NY Slip Op 32750 (Sup Ct.), *affd* 83 AD3d 540, 920 NYS2d 661 (N.Y. App. Div 2011); *Vinokur v. Sovereign Bank,* 701 F. Supp. 2d 276, 293 (E.D.N.Y. 2010).

119. Defendants knew that the Plaintiff was a person with a disability within the meaning of the Human Rights Law.

120. Defendants failed to engage in an interactive process with the Plaintiff and otherwise failed to make a reasonable accommodation for her known disability.

121. Defendants failed to enact and/or implement policies regarding engaging in an interactive process with Public Safety Dispatchers and 911 Operators, including the Plaintiff.

122. Plaintiff is entitled to declaratory and injunctive relief requiring the SCPD to enact and implement procedures to engage in an interactive process with individuals who either request accommodations or advise the SCPD of a disability.

## WHEREFORE PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

B. An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. An order directing Defendants to create and implement procedures for engaging in the interactive process with Public Safety Dispatchers and 911 Operators;

D. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages,

including but not limited to, compensation for her mental anguish and emotional distress;

F. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

G. An award of punitive damages for plaintiff to the Maximum of $300,000.00;

H. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law, and

I. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: Glen Cove, New York
December 22, 2014

> Respectfully submitted,
> STEVEN J. MOSER, P.C.
>
> Three Sch___ ___ 207B
> Glen Cove, NY 11___
> (516) 671-1150
> F (516) 882-5420
> smoser@moseremploymentlaw.com
> *Attorney for Plaintiff*